UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

               Plaintiff,

-vs-

D-1 MATTHEW MERCER-KINSER,

               Defendant.

_____/

**HON. ROBERT H. CLELAND**

**NO. 09-20001**

**OFFENSE:** 18 U.S.C. §2252A(a)(1) - transportation of child pornography

**MANDATORY MINIMUM PENALTY:** 5 years

**MAXIMUM PENALTY:** 20 years

**MANDATORY MINIMUM SUPERVISED RELEASE:** 5 years (18 U.S.C. §3583(k))

**MAXIMUM SUPERVISED RELEASE**: life

**MAXIMUM FINE:** $250,000

### GOVERNMENT'S SENTENCING MEMORANDUM AND RESPONSE TO MOTION FOR DEPARTURE OR VARIANCE FROM U.S.S.G. RANGE

The United States of America, by its attorneys, Terrence Berg, United States Attorney, and Erin S. Shaw, Assistant United States Attorney, respectfully submits this Sentencing Memorandum regarding defendant Matthew Mercer-Kinser, who is scheduled to be sentenced on June 16, 2009 at 2:00 p.m.  For the reasons provided below, the United States recommends a sentence of 136 months.

**I.     BACKGROUND**

    **A.     Defendant Collects Thousands of Images of Child Pornography**

From June 2006 to May 2008, defendant was enlisted in the United States Army.

See PSR at ¶55.  In early 2008, he was stationed at Fort Benning, Georgia.  See id. at ¶13.  While stationed at Fort Benning, defendant collected child pornography via the Internet, which he stored on his laptop and external hard drives.

Defendant's child pornography collection was prolific in terms of both volume and content.  Defendant's collection contained thousands of images of child pornography, including approximately 1800 known images of at least 101 known victims.[1]  Victim-impact statements from several of these victims are included as Exhibit 1 and will be filed separately with the Court under seal.  Defendant's collection included images that depict violent rape and sexual exploitation of babies and small children, including but not limited to the following: adult male penetrating infant female with his penis, adult male inserting penis into mouth of infant, infant female being penetrated with pliers, infant female being penetrated with marker, infant female bound with ropes and penetrated with unidentified foreign object, naked prepubescent girls bound and gagged with their genitals exposed, child performing fellatio on an animal (appears to be a goat).  See PSR at ¶15.

In late April 2008, defendant departed the military base at Fort Benning, Georgia for his home of record in Oxford, Michigan because he was in the process

---

[1]    Initially, the forensic reviewer provided a conservative estimate of 400 known images.  See PSR at ¶15.  The National Center for Missing and Exploited Children has since determined that there were 1798 known images of child pornography in defendant's collection, and that 101 known series with child victims have been identified.

of being discharged from the Army.  See id. at ¶13.  When defendant moved from Georgia to Michigan, he brought his computers with him, thus transporting his child pornography collection in interstate commerce.  See id. at ¶17.

### B.    Defendant's Unfruitful Attempt at Cooperation

The FBI learned of defendant through a referral from the Australian Federal Police, who provided evidence that defendant sent child pornography images to an undercover officer through his Google Hello photo sharing account while he was stationed at Fort Benning.  See id. at ¶11.  A search warrant for defendant's Oxford, Michigan home was executed on May 22, 2008.  He was arrested on a complaint and attempted to cooperate with law enforcement by providing access to the various accounts and passwords that he used to amass his child pornography collection.  Although federal agents initially hoped to assume defendant's online identity to engage and identify additional targets and suppliers of these images, Google shut down the Hello photo sharing program, making this impossible.

### C.    Negotiation of the Plea Agreement

The parties negotiated a plea agreement, in which defendant would plead guilty to an Information charging one count of transportation of child pornography, in violation of 18 U.S.C. §2252A(a)(1), based on defendant's move from Georgia to Michigan.  As part of the plea agreement, the United States Attorney's Office for the Middle District of Georgia agreed not to prosecute defendant for distribution of child pornography to the undercover Australian officer.  See Rule 11 Agreement at ¶9.

### D.     Defendant's Alleged Conduct While on Bond

Defendant's pleaded guilty before this Court on February 12, 2009.   At the conclusion of that hearing, defendant asked to be detained.

Weeks later, a Lapeer County Assistant Prosecuting Attorney informed counsel for the United States for the first time that a complaint was filed with the Lapeer County Sheriff's Department on January 28, 2009, alleging that defendant committed Criminal Sexual Conduct Third Degree on a minor relative.  See PSR at ¶¶38-41.  The victim alleged that when she and defendant were alone in his apartment and his 3 year-old son had gone to bed, defendant served her tequila, vodka and amaretto until she became intoxicated, and badgered her to perform oral sex on him as he watched a pornographic movie.  The victim reported that she agreed after being badgered for 10-15 minutes,  and that he ejaculated in her mouth.  See id. at ¶ 39.

Defendant was questioned about the incident by law enforcement on February 3 – just days before his February 12 appearance in this Court when he curiously asked to be detained.  See id. at ¶40.  The state prosecutor ultimately declined to seek charges against defendant "in the interest of judicial and prosecutorial economy" due to the instant case. The prosecutor has expressly noted that "while we frequently make decisions not to prosecute certain matters because of insufficient evidence, this is not one of those cases. If Mr. Mercer-Kinser were not facing such serious punishment for a sex offense in federal court, we would be seeking charges in this case for what he allegedly did to you.  In the event that something happens to change the status of his federal conviction or anticipated

- 4 -

sentence, then we would certainly reconsider this decision at that time." <u>See</u> <u>id</u>. at ¶41.

## II.    DEFENDANT'S GUIDELINES OBJECTION

Defendant objects to the Probation Department's inclusion of two points for distribution in the calculation of his total offense level. The United States does not dispute that the decision to charge defendant with transportation rather than distribution, and to omit distribution enhancements from the agreed guidelines, was negotiated by the parties. The United States agreed to these guidelines because it took a narrow view of the case charged and of any relevant conduct, with the view that the exchanges between defendant and the Australian under cover officer constitute a separate case. For this reason, defendant's claim that a 2-level distribution enhancement somehow constitutes "double counting" is illogical.

The government's decision not to include the 2 levels does not mean that the Probation Department is incorrect in including them. There is ample evidence, sufficient to meet the preponderance standard applicable at sentencing, that defendant distributed child pornography to the Australian undercover officer, as detailed in the PSR at ¶¶11-14. To be sure, defendant makes reference to this very issue in claiming that he was the victim of "aggressive reverse-marketing" by the agent. <u>See</u> Def. Mem. at 8-9. The bottom line is that the government viewed the case narrowly and limited the enhancements to those directly applicable to the charged offense in plea negotiations, in part to account for defendant's attempts to cooperate (which did not come anywhere close to substantial assistance). The Probation Department took a broader view of defendant's conduct and

included the distribution to Australia.  It is for the Court to decide which view is most appropriate in this case.

## III.    DEFENDANT'S MOTION FOR DOWNWARD DEPARTURE

Motions for downward departure in child crimes and sexual offenses are governed by 18 U.S.C. §3553(b)(2)(A)(ii) and USSG §5K2.0(b).  Defendant baldly moves this Court for a downward departure without acknowledging either of these provisions, much less establishing how their rigorous standards have been met.  Because defendant has not – and cannot – identify a mitigating circumstance sufficient to form the basis for a downward departure, the United States respectfully requests that his motion be denied.

## IV.    GUIDELINE CALCULATIONS AND RELEVANT §3553(a) FACTORS

Congress has provided, through 18 U.S.C. §3553(a), the relevant objectives and factors to be considered by sentencing courts in imposing a "sentence sufficient, but not greater than necessary."  Those objectives are: (1) the nature and circumstances of the offense, and the history and characteristics of the defendant; (2) the need for a sentence to reflect the basic aims of sentencing (including retribution, deterrence, incapacitation, and rehabilitation); (3) the kinds of sentences legally available; (4) the Sentencing Guidelines; (5) Sentencing Commission policy statements; (6) the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need for restitution.  The most relevant factors are evaluated below, beginning with the fourth objective:  the Sentencing Guidelines.

### A.    §3553(a)(4):  Advisory Guideline Range

- 6 -

In <u>Rita v. United States</u>, 127 S. Ct. 2456 (2007), the Supreme Court restated that the goals of the United States Sentencing Commission in formulating the Sentencing Guidelines are to carry out the objectives of 18 U.S.C. §3553(a). Despite being advisory, rather than mandatory, the Guidelines remain an important factor in fashioning a just sentence. As the Supreme Court stated, "[i]t is fair to assume that the Guidelines, insofar as practicable, reflect a rough approximation of sentences that might achieve §3553(a)'s objectives." <u>Id</u>. at 2464-65.

As discussed above, the parties anticipated a guideline range of 121 to 151 months, whereas Probation Department calculated the guideline range at 151 to 188 months, due to inclusion of a 2-level increase for distribution of child pornography. Regardless of which range the Court determines is applicable, defendant attacks the guidelines generally because he claims that they are not empirically supported. <u>See</u> Def. Mem. at 2.

The guidelines as anticipated by the parties in this case are 121 to 151 months, or roughly 10 to 12½ years. The mandatory minimum sentence in a transportation case, appropriate for the lowest offender, is 5 years. The maximum penalty, appropriate for the worst offender, is 20 years. The midpoint of the range, appropriate for a middle-of-the-road offender, is 12½ years (<u>i.e.</u>, top of the guideline range). Thus, this review of the minimum and maximum penalties set by Congress provides a simple and effective cross check of the guidelines, easily demonstrating why this Court should decline defendant's invitation to "disregard" them in this case.

Finally, in the Rule 11 Agreement, the United States made a non-binding

recommendation of a sentence at the midpoint of the 121 to 151 guideline range (i.e., 136 months) based on the information known to it at the time of defendant's guilty plea. These facts did not include the allegations by defendant's minor relative of defendant's alleged criminal sexual conduct, as detailed in the PSR at ¶¶38-41. The United States stands by its recommendation but asks this Court to consider all of the information regarding defendant now available in fashioning its sentence.

**B.    §3553(a)(1):  Nature of the Offense and History and Characteristics of the Defendant**

The nature of the offense and some telling features about defendant's character are described in detail above. During his final weeks in the Army, defendant had lots of time on his hands in the barracks, which he spent viewing and downloading a massive collection of child pornography. These images depicted brutal rape, bondage, sexual activity between young children and animals, and violation of infants with household objects like pliers and markers. Defendant is someone who believes that "a person can engage in any type of sexual activity as long as there is mutual consent" and that "sexual activity with a child would be okay if there is mutual consent." See Def. Ex. dated June 4, 2008 at 3. He has also confessed to being a pedophile. See id.

Defendant's beliefs apparently extend to his own family members. When chatting online with the Australian undercover officer, defendant bragged that he was molesting his 2½ year old son with the child's mother and was engaging in sexual relations with other family members. See PSR at ¶11. (Later, he told law enforcement that this was just "role play." See id. at ¶16.) As of June 2008, defendant reported that he and the child's mother

- 8 -

were living together though they had recently ended their relationship, and were "not dating each other." <u>See</u> Def. Ex. dated June 4, 2008 at 3. He also indicated that he is "not fond of children," and that he "would rather hang out with friends than be a parent," concluding that he "was not made to be a parent." <u>Id</u>. Despite these telling admissions and with the instant charges looming, defendant married this woman just months later and she is expecting their second child. <u>See</u> PSR at ¶49. Given the way he spent his free time in the Army and the negative comments he made about his now-wife and toddler son, defendant is not deserving of a "tribute" because he "joined the service and has married and commenced raising his own family." Def. Mem. at 7.

Finally, defendant points to a tragic upbringing filled with abuse. <u>See id</u>. Defendant's position cannot be that the proper reaction to abuse is to victimize someone else. To the contrary, he more than anyone should understand the terrible pain inflicted upon children by their physical and sexual abusers. Moreover, defendant was provided with mental health treatment as a 13 year old and while serving in the military. <u>See</u> PSR at ¶¶52-53. It was unable to prevent him from committing the instant offense.

### C.    §3553(a)(2)(A): Seriousness of the Offense, Promoting Respect for Law, and Providing Just Punishment

Child exploitation offenses are undeniably serious:

It should be beyond dispute that child pornography is a very serious offense. There are very real and serious harms resulting from child pornography. The necessity of strong condemnation of such behavior is also indisputable. General deterrence is a compelling factor in such cases. Child pornography is behavior that takes place in the privacy of one's home or business, as in this case. That makes it very hard to detect and because of this inherent difficulty also makes it very difficult to deter. No one can make light of the

seriousness of the crime. Both Congress and the Sentencing Commission have reached this determination. An appropriate sentence must reflect the seriousness of child pornography.

United States v. McElheney, 524 F. Supp. 2d 983, 1003 (E. D. Tenn. 2007); see also United States v. Goff, 501 F.3d 250, 259-60 (3d Cir. 2007) ("Children are exploited, molested and raped for the prurient pleasure of [defendants] and others who support suppliers of child pornography . . . .  Their injuries and the taking of their innocence are all too real.")

Defendant's conduct demonstrates that he does not respect the law.   When speaking with law enforcement at the time of his arrest, he acknowledged that he knew that viewing and distributing child pornography was illegal, but did not think that he would be caught.

Finally, providing just punishment is equally important.  As the mother of one victim writes:

My daughter is a real person. She was horribly victimized to provide this source of "entertainment."  She is exploited anew each and every time an image of her suffering is copied, traded or sold. While the crime is clearly conscienceless, it is hardly "victim-less."

I asked my daughter what she most wanted to ask of the judge. Her request: "Please, don't let them pretend no-one's getting hurt!"

She had some words for the defendant as well: "don't you know no one should do that to a little girl!  Don't you know it hurts!"

As the mother of a child victimized by this crime, I would ask that the court take into consideration the damage done by this heartless crime to my daughter and others like her (including those children who still wait for someone to rescue them from their exploitation, and have no-one here today to speak for them) and impose a sentence that

takes into account the full impact of the crime on the victims.

Ex. 1-p.

> Another victim writes:

> Each person who has found enjoyment in these sick images needs to
> be brought to justice and kept away from other people because there
> is something seriously wrong with them. They are dangerous and even
> though I don't know them, they are hurting me still. They have exploited
> me in the most horrible way. Please bring them to some real justice.

Ex. 1-d.

### D.    §3553(a)(2)(B) & (C):  Deterrence and Protecting the Public

Deterrence is a particularly relevant consideration in child pornography cases, where most cases take place in private, making them easy to commit and difficult to detect. Under such circumstances, deterrence is important to combat the normalization that occurs when offenders "may think that because they are on the Internet in their home that they are doing something that is innocent."  United States v. Kirchhof, 505 F.3d 409, 415 (6th Cir. 2007).  Anyone who seeks to exploit children should be deterred by the continued imposition of significant sentences for such conduct.

In addition to general deterrence, this is a case where defendant must also be deterred and the public protected from his further crimes.  Defendant attempts to "dispel the oft proffered theory that 'lookers become touchers'" by claiming that he is a low-risk for reoffending due to allegedly "exceptional rehabilitation efforts" through his required sessions with Dr. Sommerschield.  Def. Mem. at 2, 7.

Dr. Sommerschield's reports do not support defendant's position.   First, Dr.

Sommerschield notes as an initial matter that "as is customary, no background information was received in regard to this evaluation."  In other words, all of the information that Dr. Sommerschield received was self-reported by defendant.  Second, Dr. Sommerschield administered tests relating to personality characteristics and intelligence, such as the Minnesota Multiphasic Personality Inventory, the Rorschach test, and a "Dot Counting" test that do not even purport to address recidivism in sex offenders.  Finally, Dr. Sommerschield's final report states only that  defendant's "realization of the necessity of conforming behavior to the dictates of society and his realization of the consequences for re-offending will reduce the likelihood of reoffending."  Dr. Sommerschield does not opine that defendant is a low-risk for recidivism.

Under these circumstances, defendant's statement that "sexual activity with a child would be okay if there is mutual consent" and his admitted "age of attraction" as "zero to 14 years old" (see PSR at ¶16), coupled with his alleged criminal sexual activity with a minor relative while on bond in this case, provide a better indication of whether he is likely to reoffend.

### E.     §3553(a)(2)(D): Defendant's Need for Treatment

Defendant's sentence should provide the most appropriate forms of counseling and correctional treatment.  While incarcerated, defendant will have the opportunity to participate in continued mental health and sex offender therapy, as well as treatment for alcohol abuse.  See PSR at ¶¶52-54.

### F.     §3553(a)(6):  Avoiding Unwarranted Sentencing Disparities

Finally, the sheer volume of images and their abhorrent content involving rape of infants, bondage and bestiality distinguish defendant from other individuals who appear before this Court in child pornography cases.  When comparing his case to others "who have been found guilty of similar conduct," he stands out.  A sentence of 136 months appropriately accounts for this disparity.

## V.     DEFENDANT'S MOTION FOR A VARIANCE

As the foregoing discussion demonstrates, defendant's request for a variance below the guideline range is unsupported by the §3553(a) factors.  Moreover, the mandatory minimum sentence of 5 years is reserved for the lowest offenders.  Defendant simply is not in that category.

## VI.    GOVERNMENT'S RECOMMENDATION AND CONCLUSION

For all of the foregoing reasons, the United States respectfully requests that defendant be sentenced to the custody of the Bureau of Prisons for a term of 136 months, followed by a term of 5 years supervised release.

Respectfully submitted,

TERRENCE BERG
United States Attorney


*s/  Erin S. Shaw*
ERIN S. SHAW
Assistant United States Attorney
211 West Fort Street
Detroit, MI  48226
(313) 226-9182
erin.shaw@usdoj.gov

Dated:  June 9, 2009

- 13 -

**CERTIFICATE OF SERVICE**

I hereby certify that on June 9, 2009, I electronically filed the foregoing document

with the Clerk of the Court using the ECF system which will send notification of such filing

to the following:

Randall C. Roberts, Esq.

*s/ Erin S. Shaw*
ERIN S. SHAW
Assistant United States Attorney
211 West Fort Street
Detroit, MI 48226
(313) 226-9182
erin.shaw@usdoj.gov